204

[608 NYS2d 405]

JACOB UNGAR et al., Appellants, v ENSIGN BANK, FSB, et al., Respondents.

First Department, February 22, 1994

## APPEARANCES OF COUNSEL

*I. Jeffrey Corbin* of counsel, New York City *(Gary S. Mayerson* with him on the brief; *Graubard Mollen Horowitz Pomeranz & Shapiro,* attorneys), for appellants.

*Anthony A. Dean* of counsel, New York City *(Marian E. Baldwin, P. Matthew Sutko* and *Munsell St. Clair* with him on the brief; *Windels Marx, Davies & Ives,* attorneys), for Resolution Trust Corporation, as receiver for Ensign Bank, FSB.

## OPINION OF THE COURT

SULLIVAN, J. P.

This appeal presents, *inter alia,* the issue of whether a State court action commenced against a savings and loan institution prior to its takeover by the Resolution Trust Corporation (RTC), as receiver, may, pursuant to the provisions of 12 USC § 1821 (as amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 [FIRREA] [Pub L 101-

73, 103 US Stat 183 *et seq.*]), be "continued" in State court after the plaintiff has exhausted the administrative requirements of FIRREA. We hold that the plaintiff may continue the action.

Plaintiffs Jacob and Iren Ungar commenced this action on May 8, 1989 for damages and other related relief for the alleged conversion of certain bearer bonds having a face value of $445,000 and the proceeds of a $50,000 check. According to the complaint, defendant Fleet Bank, in or about August 1983, extended a line of credit in the approximate amount of $300,000 to H. Stahl Enterprises, Ltd. As part of a request to increase the credit line extension to $525,000, Jacob Ungar executed an assignment to Stahl of a number of securities, including the bearer bonds at issue, which Ungar's broker delivered directly to Fleet, as collateral. According to the terms of the assignment, the "[c]oupons being clipped on maturity, should be credited to Jacob Ungar." In fact, Fleet did clip the bond coupons as they became due and mailed them directly to Jacob Ungar. Ultimately, it is alleged, Fleet extended Stahl's line of credit, without disclosing the same to the Ungars, to more than $1,200,000.

Sometime in March 1987, Stahl ceased doing business with Fleet and established a new banking relationship with Ensign Bank, FSB, to which the Ungars' bearer bonds and coupons were transferred. On May 17, 1988, the Ungars provided Stahl with a $50,000 check to be deposited in a special account at Ensign allegedly to enable Stahl to exchange noncoupon bonds of equal face amount for the coupon bonds which Ensign was holding. When Stahl defaulted on its loan obligations in March of 1989, Ensign called in the loan and sold the bonds. The proceeds of the $50,000 check were also used as an offset against Stahl's indebtedness. This action was commenced immediately thereafter against both Fleet and Ensign. The Ungars allege that they never agreed to provide Fleet with any collateral security except to the extent of the underlying face amount of the bonds and only with respect to a credit extension of $525,000.

On August 30, 1990, 15 months after the commencement of this action, the United States Treasury, Office of Thrift Supervision, appointed RTC as receiver of Ensign, a Federally chartered savings and loan bank, which ultimately failed. RTC succeeded by operation of law to all of Ensign's "rights, titles, powers, and privileges" in its assets (12 USC § 1821 [d] [2] [A] [i]). After serving a notice of appearance in April of 1991, RTC

moved to dismiss the action for lack of subject matter jurisdiction on the ground that the Ungars had not yet submitted their claims to FIRREA'S mandatory review process. The Ungars cross-moved for a default judgment for the failure of Ensign to comply with a prior discovery order. The IAS Court agreed with RTC's jurisdictional argument and, in a December 3, 1991 order, dismissed the complaint "without prejudice to plaintiffs continuing their claims" consistent with the provisions of FIRREA. In dismissing the complaint, the court, noting the provisions of 12 USC § 1821 (d) (6) (A) (ii), expressly declined to decide, "at this juncture, whether the plaintiffs may, if so advised after the administrative review process, properly pursue their claims in this court as opposed to federal court." The order denied the cross motion "without prejudice to renewal before a court or tribunal of competent jurisdiction, after pursuing administrative review" under FIRREA. No appeal was taken from this determination.

On November 15, 1991, the Ungars filed an administrative claim, to which RTC, which had the authority initially to determine their claim against Ensign (see, Espinosa v DeVasto, 818 F Supp 438, 440 [D Mass 1993]), failed to respond within the mandated 180 days for allowance or disallowance thereof (12 USC § 1821 [d] [5] [A] [i]). Thus, by May 13, 1992, the Ungars had fully exhausted their administrative rights under FIRREA.

12 USC § 1821 (d) (6) (A) expressly provides that, subject to certain time constraints not here relevant, a claimant shall be permitted to "continue" a suit commenced prior to the appointment of the receiver. On the basis of this statutory provision, the IAS Court's earlier order conditionally dismissing the Ungars' complaint "without prejudice to plaintiffs continuing their claims" and the denial of their cross motion for a default judgment "without prejudice to renewal," the Ungars timely moved to continue their action and for a default judgment unless defendants comply with prior discovery directives. In a decision dated September 24, 1992, the IAS Court denied the motion, holding that the earlier denial, without prejudice to a renewal, of the Ungars' cross motion was error, and, sua sponte, deleted the December 3, 1991 order's provision for renewal, noting that the Ungars "may, if so advised, provided such action is timely, and in conformity with any state or federal statutes and/or regulation regarding same, commence a new proceeding against Ensign in an appropriate forum." This appeal followed.

■ As a threshold matter, the Ungars argue that in the absence of a motion therefor the IAS Court was without power to delete, *sua sponte,* a critical provision in its earlier order, i.e., the renewal provision with respect to the cross motion for a default judgment. This argument is without merit. The deleted portion of the order provided that the denial of plaintiffs' cross motion for a default judgment "is denied without prejudice to renewal before a court or tribunal of competent jurisdiction, after pursuing administrative review under the FIRREA." This provision was not in accord with the decision upon which the December 3, 1991 order was based; no right to renew was afforded by that decision. Courts may cure mistakes, defects or irregularities in their judgments and "may even correct matters of substance where the record offers irrefutable support for such a correction" as long as a substantial right of a party is not prejudiced. *(Solomon v City of New York,* 127 AD2d 827, 828.)

Amendment of the earlier order did not prejudice the Ungars. The deleted portion of the order is not the provision upon which they apparently relied for the continuance of their action. They specifically moved both to continue the action and for a default judgment for failure to comply with prior discovery directives and do not on this appeal challenge the denial of their request for a default judgment. Moreover, even though the renewal provision was deleted by the September 24, 1992 order, it remained in effect until that order was entered and plaintiffs were entitled to rely on it to support their belief that the action was still pending. Thus, the Ungars were not prejudiced by the subsequent deletion of the renewal provision, and we therefore reject their claim that the court erred in deleting said provision.

We do, however, agree with the Ungars that the December 3, 1991 order effectively stayed the action pending exhaustion of FIRREA's administrative requirements. While the order dismissed the complaint, the dismissal was not absolute; it was "without prejudice to plaintiffs continuing their claims, or otherwise pursuing remedies consistent with [FIRREA]." The memorandum decision upon which the December 3 order was based stated that "until plaintiffs' administrative remedies are exhausted, this court does not have subject matter jurisdiction to entertain this action" and that "[t]he court need not decide, at this juncture, whether the plaintiffs may, if so advised after the administrative review process, properly pursue their claims in this court as opposed to federal court." That lan-

guage, coupled with the provision in the order denying the cross motion without prejudice to renewal, can only be interpreted to indicate that the action was held in abeyance rather than unconditionally dismissed.

 The substantive question before us is whether the Ungars may continue this State action or whether they must commence a new action in the Federal court subject to FIRREA and its relevant regulations. RTC takes the position that 12 USC § 1821 (d) (6) (A) vests the Federal courts with exclusive jurisdiction over claims against RTC as receiver of failed savings and loan institutions. The Ungars, citing the same statutory provision, argue that a claimant who commences an action prior to the appointment of RTC as receiver and who has exhausted FIRREA's administrative remedies may thereafter continue the action in the court in which it was pending at the time of the receiver's appointment.

In enacting FIRREA, Congress created a comprehensive legislative scheme to resolve the crisis facing the savings and loan industry in the late 1980's. *(See, Resolution Trust Corp. v Cheshire Mgt. Co.,* 18 F3d 330 [6th Cir, Feb. 8, 1994].) Under the Act, responsibility for the liquidation and disposition of the assets of insolvent savings and loan institutions whose deposits were insured by the Federal Savings and Loan Insurance Corporation (FSLIC) is transferred from the FSLIC to the RTC. The receivership power, including the power of liquidating the institutions' assets and using them to pay the bona fide claims of receivership creditors, is among the powers transferred to the RTC. FIRREA provides for a mandatory administrative claims procedure, set forth in 12 USC § 1821 (d) (3), the purpose of which is " 'to dispose of the bulk of claims against failed financial institutions *expeditiously* and *fairly*' " *(Espinosa v DeVasto, supra,* 818 F Supp 438, 440, quoting HR Rep No. 101-54 [I], 101st Cong, 1st Sess 419, reprinted in 1989 US Code, Cong & Admin News 86, 215). Consistent therewith, Congress withdrew from the courts the jurisdiction to hear claims against RTC as receiver until the mandatory administrative claims process is fully exhausted *(see,* 12 USC § 1821 [d] [13] [D]); a claimant must comply with the claims process before seeking judicial relief *(see, Resolution Trust Corp. v Elman,* 949 F2d 624, 627 [2d Cir 1991]) even where the claimant has previously initiated an action against the institution *(see, e.g., Resolution Trust Corp. v Mustang Partners,* 946 F2d 103 [10th Cir 1991]).

Although there is provision for administrative review of the

claim determination (12 USC § 1821 [d] [7] [A], [B]), there is none for judicial review of that determination. After exhaustion of the administrative procedures, a claimant may either bring a claim de novo in the Federal District Court or continue a previously filed suit to establish a disallowed claim. (12 USC § 1821 [d] [6] [A]; see, HR Rep No. 101-54 [I], 101st Cong, 1st Sess 418-419, reprinted.) It is the latter provision—allowing a claimant who commences an action prior to the appointment of a receiver and who exhausts the statute's administrative claims process thereafter to "continue" the action—which is at the heart of this controversy.

In pertinent part, section 1821 (d) (6) (A) provides:

"Before the end of the 60-day period beginning on the earlier of—

"(i) the end of the [180-day] period described in paragraph (5) (A) (i) with respect to any claim against a depository institution for which the Corporation is receiver * * *

"the claimant may request administrative review of the claim * * * or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)."

Section 1821 (d) (5) (F) (ii) and (8) (E) (ii), insofar as relevant, provide: "[T]he filing of a claim with the receiver shall not prejudice any right of the claimant to continue any action which was filed before the appointment of the receiver."

While RTC argues that the Ungars should not be permitted to continue this action but should be required, instead, to recommence their action in the appropriate Federal District Court, FIRREA, on its face, says nothing of the sort. In the plainest language, subdivision (d) (6) (A), (5) (F) (ii) and (8) (E) (ii) of section 1821 explicitly provide that a claimant may continue his previously commenced action. Congress's use of the word "continue" can only be interpreted to mean that a case pending in the State court prior to the appointment of a receiver may be continued in that court and that, under FIRREA, concurrent jurisdiction exists between State and Federal courts. We agree with the observation that "careful scrutiny of words as chosen by Congress along with a thorough review of the legislative history text leads to the conclu-

sion that Congress enacted this legislation in such a way so that suits brought prior to appointment of the FDIC as receiver receive different treatment under the statutory provisions [from] suits brought subsequent to appointment of the FDIC as receiver." *(Federal Deposit Ins. Corp. v Grillo,* 788 F Supp 641, 646-647 [D NH 1992].)

Case law interpreting FIRREA is consistent with the statute's clear language. *(See, e.g., Marc Dev. v Federal Deposit Ins. Corp.,* 771 F Supp 1163 [D Utah 1991], *affd* 992 F2d 1503 [10th Cir 1993]; *Marquis v Federal Deposit Ins. Corp.,* 965 F2d 1148 [1st Cir 1992]; *Aliberti, Larochelle & Hodson Eng'g Corp. v First Meridian Group,* 795 F Supp 42 [D Me 1992]; *Simms v Biondo,* 785 F Supp 322 [ED NY 1992].) In both *Marc Dev.* and *Marquis,* the plaintiffs commenced State court actions. In *Marc Dev.,* upon its appointment as receiver for the insolvent bank, FDIC removed the action to Federal court and sought to stay the proceedings under 12 USC § 1821. Similarly, in *Marquis,* the receiver removed the action to Federal court and moved to dismiss for lack of subject matter jurisdiction on the ground of the plaintiffs' failure to pursue their administrative remedies under 12 USC § 1821. After exhausting their administrative remedies, the plaintiffs sought to continue their previously commenced actions.

In both cases, the courts, after reviewing section 1821 (d) (6) (A) and (5) (F) (ii), held that the plaintiffs should be permitted to continue their actions in the court in which the actions had been pending before the commencement of administrative proceedings. In *Marc Dev. (supra,* at 1168-1169), the District Court, speaking of section 1821 (d) (6) (A)'s option to "continue" an action, stated, "The term 'continue' implies that a party is proceeding forward in an ongoing case without an interruption in the court's jurisdiction. A claimant could not 'continue' an action over which the court had been deprived of subject matter jurisdiction. The claimant would have to 'refile' such a lawsuit because the suit would have been dismissed due to lack of subject matter jurisdiction." Similarly, in *Marquis (supra,* at 1154), the First Circuit, in speaking of the disposition of pending litigation in light of FIRREA's exclusive administrative process for resolving claims against failed banks, noted:

"By staying all proceedings in a pending action until the

administrative claims process has run its course, efficacy will be promoted. At that point, suits based upon resolved claims can be dismissed outright, whereas suits based upon claims still unresolved can simply be resumed, thereby dispelling the need to retrace steps already completed. * * *

"Claimants will be spared the unnecessary costs of refiling cases and bringing them up to [date]. Courts will similarly be spared the trouble of starting [over] in each and every case in which an administrative settlement does not materialize."

In *Berke v Resolution Trust Corp.* (483 NW2d 712 [Minn 1992]), RTC, after its appointment as receiver, moved to dismiss the previously commenced State court action for lack of subject matter jurisdiction, contending that the Federal courts have exclusive jurisdiction over cases involving it. Rejecting RTC's argument that 12 USC § 1821 (d) (6) (A) confers an exclusive grant of jurisdiction upon the Federal courts, the Minnesota Court of Appeals held that such a construction of that particular statutory provision would render "the parenthetical 'continue' language null. * * * Specifically, a pre-receiver action filed in state court cannot be 'continued' after receivership if it must be dismissed from state court and refiled in federal court. Dismissal of the state court action does not continue that action. Thus, references to which federal courts may entertain an RTC action must pertain to suits filed for the first time after the claim has been processed under FIRREA's administrative procedure." (483 NW2d, *supra,* at 714.)

Finally, we note in passing that the Ungars' claims against Ensign Bank, now RTC, as receiver, are based on State law causes of action for conversion, unjust enrichment, declaratory relief and an accounting arising out of Ensign's alleged misappropriation of the bearer bonds and $50,000 check. The New York State Supreme Court is clearly able to resolve such State law claims.

Accordingly, the order of the Supreme Court, New York County (Edward J. Greenfield, J.), entered on or about October 6, 1992, which, *inter alia,* denied plaintiffs' motion for leave to continue their State court action, should be modified, on the law, the motion granted, the matter remanded for further proceedings and, except as thus modified, affirmed, without costs or disbursements.

CARRO, ROSENBERGER and WALLACH, JJ., concur.

Order, Supreme Court, New York County, entered on or about October 6, 1992, modified, on the law, plaintiffs' motion for leave to continue their State court action granted, the matter remanded for further proceedings and, except as modified, affirmed, without costs or disbursements.